+WILLIAM H. SIMMONS v. TOLEDO (CITY) ET AL.

1. STATUTE FORBIDDING THE USE OF UNINSULATED LIGHTING WIRES NOT APPLICABLE.

   The Act of March 12, 1886 [83 O. L., 143], does not apply to the use of wires in the streets of a city for conducting electricity to operate street railway cars.

2. COUNCIL MAY GRANT RIGHT FOR ELECTRIC RAILWAY—NOT VOID FOR MISNOMER.

   A city council has the power, by ordinance, to grant, under proper conditions and restrictions, the right to construct and operate an electric street railway in the streets of the city. Such grant is not rendered invalid by reason of the fact that the grantee is designated in such ordinance as a "trustee."

3. APPLICATION IN THE ALTERNATIVE—PUBLICATION NEED NOT BE DAILY.

   An application to a city council for leave to construct a street railway may designate a portion of the proposed route in the alternative; and publication of notice of such application on the same day of the week for three consecutive weeks in a daily newspaper published and of general circulation in such city is, under section 2502 Rev. Stat., sufficient in a case where the council proceeding under such notice, passes an ordinance granting the right, notwithstanding a general ordinance of the city required such notices to be published in two daily papers of the city.

4. GRANT OF RIGHT OF WAY BY CITY COUNCIL.

   The grant by a city council of the right to construct and operate a street railway is not necessarily invalid by reason of its covering only a part of the route specified in the original application.

5. BID TOO LATE AND WITHOUT BOND MAY BE REJECTED—INFORMALITY IN BIDDER'S BOND NOT GROUND FOR INJUNCTION IN SUIT BY A TAXPAYER.

   A city council caused notice to be published of an application for leave to construct and operate a street railway. Said notice was dated, and stated that "said application will be for hearing after three weeks publication of this notice." No time for the filing of bids for the franchise, or for the consideration thereof, was otherwise fixed. After the expiration of three weeks from said first publication, and after certain bids had been filed, said council, in good faith, and in order to assure itself of the sincerity of bidders in making their bids, adopted a resolution limiting the time for filing bids, and providing that each bid must be accompanied by a bond conditioned that the bidder, if his offer be accepted and the contract be awarded him, should accept the grant and construct said railway. Said bidders had knowledge and notice of said resolution in time to refile their bids and procure and file the required bonds. Held: That the council might properly reject any bid because not filed within the time so limited, or because not accompanied by the required bond. Held, also: That, if the council, acting in good faith, grants the right to construct and operate a street railway to one whom it finds to be the lowest bidder, such grant will not be held invalid at the suit of a taxpayer of the city, and who was not a bidder for said right, simply because the bond accompanying such successful bid did not conform to the requirements of said resolution, and the bond accompanying the bid of another person did so conform.

6. DETERMINATION OF COUNCIL AS TO LOWEST BIDDER NOT TO BE INTERFERED WITH UNLESS CLEARLY ERRONEOUS

   The grant of such right to one whom the council has in good faith found and determined to be the bidder offering to carry passengers over said proposed railway at the lowest rates of fare, will not in such suit, be held invalid on the ground that his bid was not in fact the lowest bid, without clear proof that the council erred in such finding. (Certain bids on street railway fares compared.)

7. ONLY AN ABUTTER CAN HAVE INJUNCTION FOR WANT OF CONSENTS—TAXPAYER CANNOT.

   A plaintiff, not an owner of any lots or lands abutting on any street on the route of a proposed street railway in a city, who brings suit under secs. 1777 et seq. Rev. Stat., against the city and those to whom the city has by ordinance granted the right to construct and operate a street railway in such city, to enjoin proceedings under such grant, will not be heard to complain that the owners of a majority of the feet front of such abutting lots and lands have not given their written consent thereto.

---

*This decision was affirmed by the Supreme Court without report, December 22, 1893. The circuit decision was cited by the same court in Sanfleet v. Toledo, 8 Cir. Dec , 711, 717, and in Tol. Con. St. Ry. Co. v. St. Ry. Co. *post*, 493, 504; and again by the same court, sitting in Erie county, in Sloane v. Railway Co., *post*, 674, 678; it was also cited, as authority, as to the nature of the action, by the common pleas in Gallagher v. Johnson, 1 Dec., 265; and by the superior court in Glidden v. Cincinnati, 4 Dec., 427.

BENTLEY, J. (orally).

This is an action brought by William H. Simmons, a resident taxpayer of the city of Toledo, as he states, on behalf of himself and other taxpayers in the city, under sec. 1777 Rev. Stat., et seq., he having made written application to the city solicitor, to bring this action, and that application having been refused by the solicitor. In his petition, he alleges the illegality of a certain ordinance granting to "David Robison, Jr., trustee," the right to construct, maintain and operate, an electric street railway in certain streets of said city, passed by the board of councilmen on the 18th of March, 1889, and by the board of aldermen on the 27th of March, 1889, and asking, in effect, that said ordinance be adjudged illegal, null and void, and that the city and its officers be enjoined from causing or permitting it to be published or in any way carried into effect, and that said Robison and his alleged cestui que trusts, who are also made defendants, be enjoined from filing any acceptance of the terms of said ordinance with the city clerk.

The petition was filed in the court of common pleas of this county, April 6, 1889, and a temporary order was granted by a judge of that court restraining the defendants as prayed for until the parties could be further heard, at a date fixed; and thereafter, on hearing, a temporary injunction was allowed—or possibly it took the form of a modification of the restraining order—restraining the defendants as prayed for, except that the ordinance was allowed to be published and its terms accepted and bond filed by Robison and his associates, without prejudice to the rights of the plaintiff, as the ordinance itself prescribed that such acceptance and bond must be filed within thirty days after the passage of the ordinance; and which said acceptance and bond, we understand, were afterwards filed within the time prescribed. After the overruling of the plaintiff's demurrer to the answer of the defendants in the court of common pleas, the case was tried in that court on its merits, and judgment was rendered for the defendants, from which judgment the plaintiff appealed to this court. Afterwards an application was made to the judges of this court, at chambers, by motion, to dissolve the temporary injunction, which, we think, was still operative. On the hearing affidavits were used, and the main features of the case were ably discussed, but no proof was offered aliunde the bids themselves, to show which of the bids filed was the lowest. The case being important, and the judges, desiring further light on the matter, especially as to the comparison of the bids, refused to dissolve the temporary injunction, but set the case down for hearing, on its merits, on the first day of the present term.

The case having now been heard, at great length, upon the evidence, and fully argued, we have endeavored to consider it in all its bearings, anew, and without reference to any opinions on certain points arrived at on the hearing at chambers; and especially so far as those points have been still urged on the trial.

It appears that on January 1, 1889, David Robison, Jr., filed his written application, under sec. 2501 of the Rev. Stat., with the common council of the city of Toledo for the right to construct, maintain and operate an electric street railway along certain streets of the city, therein fully designated, signing the same "David Robison, Jr., Trustee," but without further indicating that he acted for any others than himself. The petition herein alleges that in fact he was acting for himself and the defendants James J. Robison, Orville S. Brumback, Willard F. Robison and Leander S. Baumgardner. We think that the plaintiff's position—that the city could not receive his application and bid, or contract with him under the designation named in his bid, is untenable.

Neither the said application, nor any of the instruments or records of the council regarding the matter designate which, if any, of the several kinds of electric motors now in use on street railways, is to be used; but it fairly appears from the evidence that the use of some kind is contemplated requiring the use of an

**uninsulated** wire, above the ground, which it will be necessary in order to propel cars, to keep charged with and bearing a current of electricity of great volume, in proportion to the number of cars to be moved, and of a uniform intensity of about five hundred volts.

The plaintiff claims that this use of the streets would endanger the life of persons and animals travelling on the streets, and greatly increase the danger of the destruction of property by fire, and destroy or greatly injure the usefulness and safety of the streets as such, and that in constructing the road the pavements of said streets would be torn up and said streets otherwise obstructed. Also that in allowing such use of electric wires, the statute, (83, O. L. 143), passed in 1886, forbidding the use of uninsulated wires, etc., would be directly violated.

As these objections are general, and lie at the basis of the whole scheme of allowing electric railways in the streets, it may conduce to clearness to dispose of them before discussing the objections relating more especially to details arising in the case at bar, and to preliminaries affecting the municipal legislation in question. As to the act of 1886, it is sufficient to say, that it only relates to wires erected and operated under the provisions of that act; that is, to those erected by "a company organized for the purpose of supplying electricity for power purposes and for lighting streets and buildings," and in our judgment, does not apply to the case at bar. Nor can it be used to prove the legislative policy as to electric wires in streets, since it is clearly shown by the evidence that the degree of danger from uninsulated wires varies widely according to the use to which the current is to be applied.

We have heard much testimony regarding the effect of the use of cars propelled by electricity in the public and traveled streets, but are unable to find that the dangers and inconveniences to be apprehended therefrom are such as to warrant us in holding that to allow their use in the streets would be beyond the power, or an abuse of the discretion of the council relating to streets, in view of the statute and the interpretation put upon it by the supreme court, allowing the streets to be used for purposes apparently much wider from the ordinary conception of the uses for which they are dedicated, and fraught with more dangers than the proposed use would be.

In the said application of said David Robison, Jr., trustee, one part of the proposed route is designated as:

"Also commencing at Junction avenue bridge, crossing the Lake Shore & Michigan Southern Railroad, at Air Line Junction; thence along Junction avenue to Hamilton street" and thence along Hamilton street and other streets named, to a terminus. It also contains in the course of its description of route, the following: "Thence along Sumner street and over the new Sumner street bridge to Railroad avenue; thence along said avenue as proposed (past the L. S. & M. S. R. R. depot) or along Wade street to its intersection with Morris street, thence along Morris street, etc." And said application also states: "All of said street railway franchise to be for a single track with the necessary turnouts, turn-table, appliances and equipment to operate the same, except along the following streets which is to be for a double track, with the necessary equipments, appliances, etc., to operate the same, viz.: Commencing at the Lake Shore & Michigan Southern depot on Railroad avenue as proposed to be opened, thence along said proposed Railroad avenue to Morris street," and then designating certain other streets of the route.

Except as presenting an alternative as to a certain part of the route, the application itself is not criticised by counsel for the plaintiff, and, we think, it reasonably complies with the requirements of the law.

On Jan. 7, 1889, the council, by resolution, required the clerk to

"Advertise the application of David Robison, Jr., trustee, for a franchise to construct a street railroad, to be operated by electric motive power," but did not prescribe how or in what papers, or for what length of time. And the clerk, in pursuance of said resolution, caused to be published for four consecutive Fridays, beginning January 11, in the Toledo Commercial, a daily paper published and of general circulation in the city, a notice, stating that said application, had been

made to the council, and describing the route as in said application, except that between the said two words, "double track," when they appear in the application, the words "or single" were inserted in parenthesis, and closing the notice with the statement:

"Said application will be for hearing after three weeks' publication of this notice. Dated at Toledo, this 11th day of January, 1889." (Signed), G. N. Cole, Clerk of the City of Toledo.

It did not state that bids would be received for the right to construct and operate said road, and to carry passengers over said proposed road.

The statutory provisions governing the matter, as they stood at the time of the actions complained of, are contained in secs. 2501 to 2505, and secs. 3437 to 2443, inclusive, as amended up to that time.

Section 2501. No corporation, individual, or individuals, shall perform any work in the construction of a street railroad, until application for leave is made to the council in writing, and the council, by ordinance, shall have granted permission, and prescribed the terms and conditions upon, and the manner in which the road shall be constructed and operated, and the streets and alleys which shall be used and occupied therefor; and cities of the first and second grade of the first class, and of the second grade of the second class, may renew any such grant, at its expiration, upon such conditions as may be considered conducive to the public interest.

Section 2502. Nothing mentioned in the next preceding section shall be done; no ordinance or resolution to establish or define a street railroad route shall be passed, and no action inviting proposals to construct and operate such railroad shall be taken by the council, except upon the recommendation of the board of public works, in cities having such a board, and of the board of improvements in other municipalities having such a board; and no ordinance for the purpose specified in said preceding section shall be passed until public notice of the application therefor has been given by the clerk of the corporation, in one or more of the daily papers, if there be such, and if not, then in one or more weekly papers published in the corporation, for the period of at least three consecutive weeks, and no such grant as mentioned in said preceding section shall be made, except to the corporation, individual or individuals, that will agree to carry passengers upon such proposed railroad, at the lowest rates of fare, and shall have previously obtained the written consent of a majority of the property-holders upon each street or part thereof, on the line of the proposed street railroad, represented by the feet front of the property abutting on the several streets upon which such road is proposed to be constructed."

That is as much of it as is necessary to read in the connection.

It will be seen that, while the council is forbidden to grant the franchise to any, except to one who will agree to carry passengers over the route at the lowest rates of fare, the statute nowhere prescribes the method by which the council shall ascertain who that is or may be, save in providing for the three weeks' notice of "the application." And if the said notice was properly published, we think the form of it would sufficiently comply with the law.

It is contended, however, that it was not legally published in this: First, that as a daily paper was selected, the notice should have appeared therein on every secular day for three weeks; that it should have been published in two papers, whereas it was published only in one.

In this connection, sec. 593 of the general ordinances of the city, was introduced in evidence. It is as follows:

"No person, firm, or company, shall be permitted to lay down or maintain any track, or to run cars on any track, in any public ground or street of said city, without first having obtained the consent of said council, by ordinance, designating the person or persons, firm or company, to whom the privilege is granted, the duration, terms and conditions of the grant or license, and the route or place where such tracks may be laid, or cars run; provided, that, before any such ordinance shall pass, or license be granted, such person or persons, firm or company, shall make application to the council, in writing, designating the commencement. termination and route of the proposed track, together with the number of tracks to be laid on each street, and the number of turnouts, sidetracks and turn-tables; and after three weeks' notice of such application has been given by the city clerk, by publication in two daily papers in the city; and such application shall also be accompanied by the written consent of the holders of two-thirds of the property fronting on the line of such proposed route; and provided further, that such grant or license shall be issued to the corporation, individual or individuals, that will agree to carry passengers upon such proposed railroad at the lowest rate of fare."

When a certain section of a statute of the state is cited, the court is, of course, free to and bound to consider all the provisions of the law bearing on the proposition, and to give heed to such modifications of the ordinary construction of the section cited, as are required by the inter-relation of its provisions with those of other sections pertaining to the same subject, and by the evident scope and purpose of the whole act. But if we cannot take judicial notice of the ordinances of a municipality save as they are introduced in evidence, we are unable to rid ourselves of a certain degree of embarrassment in determining how persuasive an isolated section of an ordinance should be allowed to become, in formulating a judgment, for, peradventure, other sections of the same ordinance might divert the apparent meaning of that section into channels wholly aside from the case in hand. We are, however, constrained to believe that our conclusions in this instance should not have been other than they are, were the whole ordinance before us.

It is keenly argued, that where a statute expressly grants a power to a municipal corporation, as, for instance, in this case, to require a publication in two papers, and the city passes a general ordinance requiring a publication in two papers, the statute and the ordinance stand together, as it were, with all the force of a positive statutory requirement; and that without a direct repeal of the ordinance, it is so obligatory upon the council, as to render an ordinance passed by it, contrary to the provisions of the general ordinance, as absolutely void as though in contravention of a statute.

This argument, at first, plays rather agreeably with the formative judgment, but must, we think, on sober contemplation, be held fallacious. The council which passes the conflicting ordinance is equal in authority to the one passing the general ordinance, and the last act of the legislative will of the council on any subject, where formulated with the requisites provided by statute, must govern, and no council can bind a subsequent one by prescribing extra statutory forms of procedure; and we hold, that the section of the ordinance in question is, and was, at best, but directory, and that the publication of the notice in one daily paper on the same day of the week for three weeks might properly be regarded by the council as sufficient, and would authorize it to proceed.

Within the three weeks after the first publication of the ordinance, an open offer to construct the road, and carry passengers over the route specified in the application, was filed by said David Robison, trustee, and on the 18th day of February, 1889, bids were filed by Barton Smith and W. T. Ryan; whereupon said Robison changed his bid, or filed another, in which last bid that part of the road from the bridge over the Lake Shore & Michigan Southern railroad, along Junction ave., to Hamilton street, was omitted. This part of the proposed route was shown by the evidence to be about eighteen hundred feet, and in a part of the city most thinly inhabited.

Of these three bids that of Ryan was the lowest, as we find, and up to that time the council had not taken any action prescribing the time when bidding should close, nor had it provided for the giving of bond, or other device, to insure the entering into the proper contract or constructing the road by the bidder whose offer should be accepted.

At, or about this time, a suggestion arose as to whether all the bids had been made in good faith, and whether each of the bidders would be likely to perform his bid, if accepted. Thereupon, on the 25th of February, a resolution was passed by the board of councilmen, in the following form:

"A Resolution to prescribe the Time for receiving, and to fix the amount of Bond for bids upon the Electric Street Railroad Franchise:

"Resolved, By the common council of the city of Toledo, Ohio, that all bids for the franchise of an electric street railroad, in the city of Toledo, over the route specified in the application of David Robison, Jr., trustee, shall be filed with the city clerk on or before twelve o'clock, noon, on the seventh day of March, 1889, at which time the bidding for such franchise shall be closed.

"That for the purpose of securing good faith on the part of those filing bids for the said franchise, each and every bid shall be accompanied with the names of those interested in said bid, and also by a bond properly executed in the sum of twenty-five thousand dollars ($25,000), signed by responsible parties, residents of the city of Toledo, and conditioned upon the faithful performance of the bid, and the speedy building of the road, and the same to be commenced without unnecessary delay, and completed within two (2) years from the legal passage of the ordinance, not counting time delayed by compulsory legal process, instituted in good faith."

And, on March 4, it was passed by the board of aldermen, and was approved by the mayor March 5, and published in the said daily paper on March 6, 1889.

On March 7, the said Barton Smith filed his new sealed offer or bid, accompanying it with a bond as prescribed by the resolution; and said David Robison, Jr., trustee, also filed his new sealed bid and bond, signed by himself and his alleged cestui que trusts. No other bids were filed, but said Ryan filed at the same time a written protest against the requiring of a bond, especially on so short a notice, and insisting that his former bid complied with all the requirements of the published notice, and that it should be considered.

On the trial, this protest, when offered in evidence, was objected to, and the question whether it should be excluded was reserved for disposition now. We think, for some purposes, it is competent, and refuse to exclude it.

These bids were opened by the clerk and city engineer, and came before the joint committee on railroads of the board of councilmen and aldermen on March 8. At this meeting of the committee said Robison and Smith were present, personally and by counsel, and Ryan was represented by counsel, and the committee, by unanimous vote, recommended to the common council for passage the ordinance then before them giving the franchise to said Robison, trustee. No separate vote was ever taken in the committee, or by either branch of the common council, determining in terms which of said bids was the lowest; but, on the favorable report of the committee, the council, on March 18, and the board of aldermen on March 27, passed the ordinance complained of, awarding the franchise to said David Robison, Jr., trustee. We think the determination that Robison's bid was the lowest, was necessarily involved in the action of the common council in the passage of the ordinance in question, and was involved in the vote of the committee by which it was recommended for passage.

On March 18, and before the council had taken action on said ordinance, a bid to construct said road as specified in the application, and carry passengers over it at certain rates of fare, was filed by Bick & Glann. It was accompanied by a bond in such form as was required by said resolution of March 4, and was brought to the attention of the council, but the council refused to consider it. The rates of fare in said offer of Bick & Glann were lower than those offered by any of the other bidders, and no question was made on the trial as to the responsibility of the sureties on their bond, or those on the bond of said Smith.

The said last bid of said Robison was confined, as his former one had been, to the route beginning at said Hamilton street—(excluding that part along Junction avenue), and the rates of fare in his bid, as first opened, were as follows:

"For persons over eight years of age, five cents, or twenty-four tickets for one dollar.
"For persons under eight years of age, one cent.
"Children in arms, free.
"For persons over eight years of age, between the hours of 6 A. M. and 7 A. M., also 6 P. M. and 7 P. M., three cents.
"Policemen in uniform free."

After said bid was opened, said Robison, claiming that he had intended it to contain the words "twenty-four tickets or fares for one dollar," and that he had so written it, but that the words, "or fares," had been left out by his copyist by clerical error, his attorney, or some one in his interest, in good faith, wrote in

said bid for insertion at the alleged proper place the words "or fares," but the same were almost immediately erased upon the suggestion being made that no bids could then be altered, and afterwards, on March 8, said Robison filed with said clerk, his affidavit setting up his intention in making said bid, and the said mistake, whereby his said intention was frustrated. But we cannot conclude that it is material what his original intentions were, but consider his bid as the same was when opened, and as it now is. The bond accompanying said bid of Robison, trustee, recites that the consent of a majority of the property owners upon each street or part hereof represented by the foot front has been obtained, then gives a description of the route, leaving off that part along Junction avenue, and then reads as follows:

"Know all men by these presents, that we, David Robinson, Jr., Jas. J. Robinson, O. S. Brumback, W. F. Robison and L. S. Baumgardner, are holden and stand firmly bound and obligated, unto the city of Toledo, Ohio, in the full and just sum of twenty-five thousand dollars. ($25,000), to be paid unto the said the city of Toledo, its successors or assigns; to which payment, well and truly to be made, we bind ourselves, our heirs, executors, and administrators, firmly by these presents.

Witness our hand and seals, dated the 7th day of March, in the year of our Lord one thousand eight hundred and eighty nine.

The condition of this obligation is such, that whereas, David Robison, Jr., as trustee, has made application to the common council of the city of Toledo, for the grant of an electric street railroad franchise on and along certain streets in said city, and has pursuant to statute, filed his bond to carry passengers over said railroad at a certain rate of fare as therein set forth:

Now, therefore,

If the said common council of the city of Toledo, shall within thirty days grant to the said David Robinson, Jr., trustee, a valid franchise for said street railroad upon acceptable terms, and the said David Robison, Jr., trustee, shall speedily commence the construction of said railroad without unnecessary delay after the passage of the ordinance therefor. and complete the same within two years, not counting time delayed by compulsory legal process instituted against said railroad in good faith, provided the right to operate cars over existing street railroad tracks can be obtained upon reasonable terms, then,. and in that event, this obligation shall be void; otherwise shall remain in full force and virtue in law." Signed and sealed by David Robison, Jr., James J. Robison, W. F. Robison, L. S. Baumgardner and O. S. Brumback. "The parties signing the above bond are parties interested in the bid of David Robison, Jr., trustee, for the electric railroad franchise."

It was strenuously insisted before said committee, and is still urged, that the Robison bond was really no bond at all, in that it was signed by no surety, and that it does not comply with the resolution of March 4, as to its terms, and the good faith of the committee in accepting it is impugned.

The petition in this case charges that said resolution of March 4 was unreasonable and illegal. It says: "Said resolution was unreasonable and illegal, in that it provided for no notice to persons proposing to carry passengers along said proposed railroad; and that it required an unreasonable and unnecessary bond; and in that the time therein mentioned within which such proposals and agreements should be filed was unreasonably short. And this plaintiff avers that said resolution was passed for the purpose of excluding persons from offering to carry passengers over said railway, and to exclude all competition in bidding thereon.

And as the disposition of this case might largely depend upon our conclusions as to the construction, character and purpose of that resolution, it becomes important to consider these allegations and the evidence regarding them.

First as to its being unreasonable and illegal in its terms. It will readily be seen that the power of the council, at some stage of the proceedings, to limit the time of receiving bids, is highly necessary; otherwise, the requisite legislation might never be accomplished, and the whole project of building a street railway could be forever obstructed; for at any and all times new bids could be filed just before final action was about to be taken on those already in and laboriously considered. and thus necessitate the matter being again referred, to determine which of all bids was now the lowest, and that determination be again rendered useless, in like manner by new bids being again put in, and so on ad infinitum. This

limitation might have been fixed at the time of ordering the notice of the application to be published. But while it might well have been done then, we cannot think that it might not be legally done afterwards, unless some special injury to the public or taxpayers should be shown to be liable to result, or to have resulted.

Having held the notice sufficient, we must conclude that its publication would, during the three weeks therein mentioned, be likely to attract the attention of any and all persons who would desire to bid, and that they would seasonably file their bids.

In this case three bids were filed, and it does not appear that any one who, within the reasonable time mentioned in the notice, desired to bid, was prevented from bidding before March 8. No such showing is made for Bick & Glann, and we think the council might fairly assume that all those whom the notice or any reasonable notice would attract to enter the contest, were before it with their bids on February 18. These bidders were all seasonably aware of the resolution publicly passed by one board February 25, and by the other March 4, for two of them filed bids under it, and the other filed his protest against it. Nor is there any evidence tending to show that either was embarrassed by the short time allowed in formulating his bid, or procuring his bond.

We think also that the council might, if it acted in good faith, require the bidders before it, or others who might possibly come in at the eleventh hour, to evince their good faith and ability to comply with their respective bids, by filing a bond in the sum of twenty-five thousand dollars. It was a great enterprise, and involved the expenditure of hundreds of thousands of dollars, and the providing of convenient transit for great numbers of citizens, and no evidence before us tends to prove that either of said bidders was unable to furnish the bond for want of time.

Consents over that part of the line on Junction Avenue not having been obtained, as was then known and now conceded, the council could not have granted the franchise as bid for by Ryan, Smith, or Bick & Glann, and no obligors on the bonds thus filed could probably ever have been made liable, but the requiring of bonds was perhaps as fair a sanction as the council might be able to devise and adopt.

We are not convinced, from all of the evidence adduced upon the point, that in passing the resolution of March 4, the members of the common council acted from the improper motives, or with the improper purposes attributed to them in the petition: The situation fairly required them, at some time, to pass some such legislation, or, at least, the circumstances warranted them in thinking some such measures to be necessary, and the legality of their action subsequent to March 4 must be judged in view of the effect of that resolution.

While the council did not, in terms, reject all bids filed prior to March 4, their action was regarded by all concerned as having that effect, unless we except Mr. Ryan, who protested that his bid should be still considered; but his very protest indicates that he knew the council would regard the considering of his bid as inconsistent with their action of March 4. This view of the matter would dispose of Ryan's bid and of the bid of Bick & Glann.

We are disposed to think that different rules would apply to such a case as this man would obtain if the matter regarded the expenditure of public money, and perhaps different from those applicable to an action by a bidder who claimed that his bid was unlawfully rejected.

This plaintiff is not an owner of property on any of the streets in question. He simply intervenes as a taxpayer and as representing the general public of the city, and must show that he and those whom he thus represents are injured.

In the exact regularity of the preliminaries of legislation, or the details of measures taken by the council in order to be informed as to the good faith or responsibility of bidders, or as to the relative rights of bidders in view of defects claimed to exist in their bonds, or the times of receiving their bids, he is interested

only as those things may bear upon the question of the good faith of the council and the right of the public to have its interests guarded as to the streets, and to have as low rates of fare as might, under the forms of law, be reasonably attainable.

There is no charge or complaint that the terms of the ordinance itself are illegal, or that it does not by all proper provisions protect the city and carefully guard the rights of the public, except that it is claimed to be in conflict with said act regarding uninsulated wires, and that it is not granted to the lowest bidder, and is for only a part of the route originally applied for.

The case being thus narrowed down to the consideration of Smith's bid and Robison's bid, what interest has the public, or the plaintiff as a mere taxpayer, in the contest between them, except in the question of which of them in fact is the lowest bidder?

Robison's bond is rather a loose one, and if we could find from its being accepted and from other circumstances, that the council never in fact honestly tried to get the lowest attainable bid, or never fairly compared Mr. Smith's bid and Robison's bid, to determine which was the lower, or in fact finally accepted the higher of the two bids rightfully before them, whether in good faith or bad faith, we should not hesitate to set aside its action at the suit of this plaintiff. But having found that no improper motives influenced the council, we think the plaintiff is not interested in the question whether or not Robison's bond complied with the resolution. It and the other bonds were required by the council for a certain purpose and to guide its action. If, in the honest opinion of the council, the purpose was attained, the plaintiff is not in the attitude to complain, if in fact the lower bid was accepted, whatever Barton Smith's private right might be.

It is objected that the Robison bid departed from his application, in that it left out a part of the route, and in that it presented an alternative, and in that it did not provide that a double track should be laid according to the application, and that in these particulars Mr. Smith's bid complied with the application. It would scarcely be successfully contended that the council would have no right to grant a franchise for an electric street railroad over a portion of the route described in the application; that would certainly be within its power, because the council is itself to determine finally the route over which it will grant the franchise.

In this connection it is to be observed that the council has the full right and authority, and it is its duty to prescribe the terms and conditions under which the railroad shall be built, and might perhaps prescribe what portion of it shall be double tracked, and provide for the necessary turnouts and turn-tables to be put in, and in this case, by the passage of the ordinance, it finally provided for those matters, and otherwise, we think, guarded the city with reasonable care and diligence. If Mr. Robison's bid had departed from the application, while the bids of other parties were in conformity with it, and if we should find that that was used by Robison or by the council as a means of giving Mr. Robison an unfair advantage in the matter, it would be a circumstance that certainly ought to defeat the legislation in question. The circumstances under which this legislation was passed, were peculiar, and while certain things were done by the council in accepting bids and passing bonds, etc., which it might do in furtherance of some improper motive or purpose, we cannot conclude from a fair consideration of the testimony, that the council really did have any such purpose, or that any unfairness resulted to the bidders, or to the public.

We therefore come to the final question, as to which the judges, at chambers, last summer, expressed themselves desirous of hearing testimony, as to which bid, that of Robison or that of Barton Smith, is the lower.

It is, perhaps, well to have those bids before us in the consideration of this matter. Barton Smith's offer was as follows:

"Five (5) cents for one continuous passage one or more ways over the whole or any part of said line, for each passenger over twelve (12) years of age; six (6) such fares for twenty-five (25) cents; and one (1) cent for each passenger under twelve (12) years of age; uniformed officers and employes of the city of Toledo, and ordinary packages in possession and control of passengers to be carried free."

The Robison bid, as finally passed upon by the council, was:

"For persons over eight years of age, five cents, or twenty-four tickets for one dollar.

"For persons under eight years of age, one cent.

"Children in arms, free.

"For persons over eight years of age, between the hours of 6 A. M. and 7 A. M., also 6 P. M. and 7 P. M., three cents.

"Save and except when a car shall be hired for a special purpose, then the terms will be subject to agreement between the parties."

It will be noticed that it would be difficult to determine, from those bids themselves, which offers the lowest rates of fare. The statute does not give any rules by which that shall be determined; and the testimony of experts was heard in order to throw light on the matter. It was a question, primarily at least, confided by the statute to the council for solution, and if the council has considered it and passed upon it, it is the rule of law that courts should not disturb its findings, unless it is reasonably clear that the finding was erroneous.

To determine the question, it is manifest that inquiry should be addressed as to the comparative numbers of the different kinds of passengers provided for in the bids that would probably ride, and as bearing on that, the testimony would be pertinent as to the comparative travel in different hours of the day. From the nature of the case, these things cannot be ascertained by mathematical formulae, nor with very close accuracy. We can, at best, but approximate the truth, being compelled to leave some margins of conjecture.

The testimony of Mr. Seagrave, a very intelligent and experienced witness for the plaintiff, is that in its practical effect on the rates of fare, the omission or addition of the part of the route on Junction avenue, embraced in the application but not in the ordinance, would amount to nothing appreciable. And, granting the entire accuracy of his calculations, the average rates of fare in Mr. Smith's bid would be 4.25, and in Robison's 4.40, leaving a difference in favor of Smith's bid of fifteen one-hundredths of a cent. Mr. Seagrave bases this, among other things, on his thought that only twelve per cent. would ride between 6 and 7 A. M. and 6 and 7 P. M., and that sixteen per cent. would be children under twelve, and eight per cent. children under eight years of age. His calculation is, that as to Smith's bid, the number of passengers over twelve years of age would be 84 per cent. at 5 cts., and that the number of passengers under twelve years of age would be 16 per cent. at 1 cent; that would make up the entire 100 per cent. of travel. He says that the slight difference in favor of the sale of six tickets for 25 cts. as against the sale of 24 for $1, might reduce Smith's bid to an average of 4.33 cts., and that officers and employes of the city being carried free, might reduce it to 4.25 cts. average fare. The Robison bid, he thinks would show this: that 80 per cent. would ride at 5 cts., eight per cent. at 1 cent, and the travel at 3 cts. between six and seven in the morning and the evening would be 12 per cent., which would make an average fare of 4.44 cts. per passenger. He thinks that the sale of tickets in packages of 24 for a dollar would, perhaps, reduce that 2 per cent., leaving it 4.42 per cent., and the reduction on account of policemen being carried free, would reduce it still further to 4.40 cts. He proceeds to give in detail what his thought is as to the percentage of travel during all the hours of the day in which street cars would be run.

Mr. Gilmartin is also called as a witness, and he gives his ideas of the percentages. His idea was, that under the Robison bid 66 per cent. would ride at five cents, 8 per cent. at one cent, and 10 per cent. at three cents; that at 24 tickets for $1, passengers riding under that arrangement would be 15 per cent., and 1 per cent. for policemen in uniform free.

Under Smith's bid, he estimates that 50 per cent. would ride at five cents; that 30 per cent. would ride at six fares for 25 cts.; that the children under 12 years would be 15 per cent, and that 5 per cent. of free passengers would ride.

Other experts were called, for instance, Mr. McNair. He estimates that under Smith's bid 30 per cent. would pay five cents fare; at tickets 6 for 25 cts., 52 per cent.; under 12 years of age at 1 cent fare, 15 per cent., and 3 per cent. free. Under the Robinson bid, 64 per cent. would travel at a five cent fare, 20 per cent. would take advantage of 24 tickets for $1; that 8 per cent. would ride at 1 cent, and that only 7 per cent. would ride between the hours of 6 and 7 in the morning and 6 and 7 in the evening, and free, 1 per cent. So far the plaintiff's witnesses, it will be noticed, differ to a considerable extent in their estimates of these percentages.

On behalf of the defendants it appeared by various witnesses, that in their judgment the per cent. of persons who would ride between the hours of six and seven in the morning and six and seven in the evening would be much larger than the estimates already alluded to— running, I think, from 18 per cent. as high as 23 per cent. And testimony was given also fairly tending to show it questionable whether the estimates of plaintiff's witnesses in regard to the relative number of children riding between the age of eight and twelve years were as testified to by plaintiff's witnesses—it being claimed that the difference made by plaintiff's witnesses between those classes of travel was too marked, and that between eight and twelve years was a time when comparatively few children would ride upon the street cars.

Now, if we could take the estimates of these different witnesses and take out the high estimates in one and apply them in their proper place to the estimates of another, we could make it appear that any one of these bids that we saw fit was the lowest bid; in fact, from all this it will readily appear that the question here on that issue cannot be determined to a nicety, and that when we, or any court, has applied to its solution, our or its best judgment, an uncertainty would still be felt, as to whether the conclusion, whatever it might be, might not turn out in practice to have been erroneous.

It might be proper to call attention to another matter. It is set up in the amendment to the petition that the requisite number of consents along the line of this proposed road had not been obtained—never having in fact been obtained. In passing upon that matter we considered that the plaintiff could not fairly raise that question. It appears that the plaintiff—as has already been said, is not an owner of property along the proposed road, but intervenes merely as a taxpayer in behalf of himself and the general public, and we hold that as to whether consents had been obtained along all the proposed line or not, he could not be heard to complain—he was not specially injured; that, for anything that appeared, all of the property owners, not appearing here or making any objection, have acquiesced in the running of the railroad along the streets upon which their property abuts, and that, where all of the property holders, possibly, consent, it would not be proper for the plaintiff—an outsider—to raise the question which they have probably waived and are not insisting upon, and therefore it was that the plaintiff's testimony regarding the consents was excluded.

In conclusion, we would say, that with these views of the law, and upon these determinations of the facts in the case, we do not think that we are permitted to disturb the findings of the council on this matter; that their final act in passing the ordinance in question was in conformity with the law; that as it required the ordinance to be accepted and the bond filed, and as the ordinance has been accepted and the bond filed, and as the plaintiff himself says that Robison and his associates are about to construct this railroad according to the ordinance, it would seem that the public, at least, could not have been injured by any irregularities in the Robison bond, or in his bid not strictly conforming to the application. The application was such that it could not have been, in its entire terms, granted by the council.

We therefore refuse to allow the injunction prayed for in the petition, and the petition will be dismissed at the costs of the plaintiff.

Baker, Smith & Baker, Pratt & Wilson, attorneys for plaintiff.

Orville S. Brumback, Gilbert Harmon, Emory D. Potter, Jr., and John F. Kumler, attorneys for defendants.